## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**HOWARD RAMSAY,**

      **Plaintiff,**

                                      **Civil Action 2:14-cv-858**

     **v.**                              **Judge Michael H. Watson**

                                      **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Howard Ramsay, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for social security disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 15), and the administrative record (ECF No. 7). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.     BACKGROUND

Plaintiff filed his application for benefits in May 2011, alleging that he has been disabled since October 2010 due to memory problems, depression, HIV, constant headaches, weight loss, and difficulty sleeping. (R. at 195–96, 209.) He subsequently alleged disability due to heart failure with shortness of breath, dizziness, tiredness, and chest pain. (R. at 257, 262.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing

before an administrative law judge.  Administrative Law Judge Joseph L. Heimann ("ALJ") held a video hearing on April 2, 2013, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 32–64.)  Nancy J. Borgeson, a vocational expert, also appeared via telephone and testified at the hearing.  On April 12, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 9–25.)  On June 9, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–6.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified that he stopped working in 2009.  He stated that he lives in a house with two close friends.  (R. at 38.)  He indicated that he spends most of his time in his room and does not assist with the cooking or cleaning.  (R. at 38-39.)

Plaintiff testified that he often feels dizzy and tired, particularly when walking, and that his medications make him feel sleepy.  (R. at 40.)  (*Id.*)  He also said that he feels depressed, cries a lot, and has memory problems.  (R. at 44.)  Plaintiff stated that his most significant physical problems included his heart and HIV status.

Plaintiff indicated last saw a cardiologist the year prior to the hearing, but that he was still taking medication for his heart.  He was to return to the cardiologist in August of that year.  (R. at 45.)  Plaintiff acknowledged that the cardiologist instructed him to exercise, but said that he was not following that recommendation.  He testified that he did not feel comfortable walking far unless he could take breaks.  When asked about his HIV status, Plaintiff replied that his T-

2

cells[1] count was going up.  (R. at 47-48.)  He said he gets sweaty hands and boils on his leg.  (R. at 48.)

With regards to his mental health treatment and medication adjustments, Plaintiff testified that he feels like a zombie and that he has difficulty remembering things that used to be simple. Plaintiff acknowledged that his psychiatrist, Dr. Chittiprolu, had encouraged him to try to walk and to be more social.  Plaintiff added that when he told Dr. Chittiprolu that he has tried unsuccessfully, Dr. Chittiprolu told him that regardless he needed to be more active physically or socially if he wanted to improve.  (R. at 52.)

## B.      Vocational Expert Testimony

Nancy J. Borgeson testified via telephone as the vocational expert ("VE") at the administrative hearing.   (R. at 53-63.)  Prior to any hearing testimony, the ALJ confirmed that Plaintiff did not object to the VE's testimony via telephone: "The first question is do you have any objections to telephonic testimony by the VE[?]" (R. at 35.)  Plaintiff's counsel indicated that Plaintiff did not object.

The VE testified that Plaintiff's past relevant employment was as a general clerk, classified as at the light level of physical demand, but performed at the sedentary, semi-skilled level.  (R. at 54-57.)

The ALJ then asked a series of questions regarding a hypothetical individual with Plaintiff's age, education, and work experience.  The VE testified that the hypothetical individual

_____

[1]T-cells are a type of white blood cells. They make up part of the immune system. T cells help the body fight diseases or harmful substances. The terms "CD4 cell" and "T-cell" both refer to the same type of cell—a CD4 T lymphocyte—and are often used interchangeably. *See* http://www.nlm.nih.gov/medlineplus/ency/article/003516.htm.

with the residual functional capacity ("RFC") the ALJ ultimately determined for Plaintiff could perform sedentary, unskilled jobs in the economy such as a table worker, with 27,000 jobs in state economy and 102,000 nationally; a general office clerk, with 10,000 jobs in the state economy and 220,000 nationally; and a final assembler in the optical goods industry, with 8,000 jobs in the state economy and 150,000 jobs in the national economy.  (R. at 60.)  Upon further questioning, the VE indicated that the individual could not sustain full-time work should he need to miss three or more days per week per month due to health reasons.  In response to cross-examination by Plaintiff's counsel, the VE testified that the individual would also be unemployable if he needed to be off task more than fifteen percent of the time.  (R. at 61.)

### III.    MEDICAL RECORDS

**A.    Physical Impairments**

**1.    OSU Hospital**

Plaintiff presented to the emergency room in September 2010 with headaches and dizziness.  He underwent a lumbar puncture to rule out neurosyphilis.  (R. at 312-13.)  A head CT showed minimal mucosal thickening, but was essentially normal.  (R. at 301-02.)  A chest x-ray was also normal.  (R. at 303.)

In November 2010, Plaintiff was seen in the Infectious Diseases Clinic with a new diagnosis of HIV and syphilis.  Plaintiff had been diagnosed by the Columbus Public Health Department two months prior.  His lumbar puncture was negative, and he received three intramuscular injections of penicillin.  Since September 2010, Plaintiff's syphilis symptoms had

improved, with his most recent CD4 level was 230.[2]  (R. at 294.)  His physical examination revealed left inguinal lymphadenopathy and cervical adenopathy.  (R. at 295.)  Plaintiff was assessed with HIV, Syphilis; Pneumocystis pneumonia Prophylaxis[3]; and potential anal lesion.  (R. at 297.)  A chest x-ray was normal.  (R. at 300.)  Records from December 2010 through April 2011 show a decreasing viral load.  (R. at 318-19.)

In August 2011, Plaintiff's CD4 level were steadily improving, and his medications were continued.  (R. at 487.)

Plaintiff presented to the Internal Medicine clinic with dizziness and palpitation on September 15, 2011.  (R. at 360.)  He exhibited sinus arrhythmia on an EKG and his LVEF (Left Ventricle Ejection Fraction) was measured at 30-35%. [4]  (R. at 398.)

When seen on October 19, 2011, Plaintiff exhibited chest pains and palpitations.  His examination was negative for dyspnea on exertion, orthopenea, leg swelling, and PND (paroxysmal nocturnal dyspnea).  (R. at 399.)  Plaintiff indicated that he was not experiencing

---

[2]CD4 count is a lab test that measures the number of CD4 cells in a sample of your blood. It is an indicator of how well a person's immune system is working. The CD4 count of a healthy adult/adolescent ranges from 500 cells/mm3 to 1,200 cells/mm. A very low CD4 count (less than 200 cells/mm) is one of the ways to determine whether a person living with HIV has progressed to stage 3 infection (AIDS).  https://www.aids.gov/hiv-aids-basics

[3]Pneumocystis pneumonia (PCP) is a form of pneumonia, caused by the yeast-like fungus, being a source of opportunistic infection, it can cause a lung infection in people with a weak immune system. Pneumocystis pneumonia is especially seen in people with cancer undergoing chemotherapy, HIV/AIDS, and the use of medications that suppress the immune system. http://www.cdc.gov

[4]Ejection fraction is a test that determines how well the human heart pumps with each beat. Ejection fraction is usually expressed as a percentage. A normal heart pumps a little more than half the heart's blood volume with each beat. A normal LVEF ranges from 55-70%. An EF of less than 35% increases the risk of life- threatening irregular heartbeats that can cause sudden cardiac arrest (loss of heart function) and sudden cardiac death.  http://www.clevelandclinic.org

shortness of breath.  David Chambers, M.D., noted that Plaintiff had "significant functional impairment" and that he that becomes "profoundly fatigued with ADLs."  (R. at 400.)  He noted Plaintiff was not currently in treatment.  Dr. Chambers prescribed medication and referred Plaintiff to cardiology.  (R. at 400.)

On November 21, 2011, Plaintiff was seen by Theodore Fraker, M.D., of the Heart and Vascular Center.  Dr. Fraker noted Plaintiff appeared to be largely asymptomatic and continued to be except for Plaintiff's self-reported intermittent episodes of dyspnea upon exertion.  (R. at 428.)  Dr. Fraker explained that Plaintiff reported that he "occasionally get[s] short of breath" when doing errands such that he needs to sit down for 15-20 minutes before resuming his activities.  (R. at 428.)

Dr. Fraker opined that Plaintiff's cardiomyopathy "is most likely secondary to his underlying HIV infection."  (R. at 432.)  Dr. Fraker noted that given the incidence of accelerated atherosclerosis in patients who have HIV, it would be reasonable to complete an ischemic evaluation.  Given Plaintiff was not complaining of exertional chest pain, Dr. Fraker noted his plan to titrate Plaintiff's medical therapy and obtain a nuclear stress test.  Dr. Fraker further noted that Plaintiff had a thorough evaluation for other etiologies for his heart, including a recent thyroid assessment that was normal.  Dr. Fraker also noted that Plaintiff's blood pressures had all been within the normal range as well.  (R. at 432.)

Plaintiff underwent a stress test on November 28, 2011, which was normal at rest and stress with no evidence of ischemia.  (R at 491.)  Plaintiff exhibited no chest discomfort.  He was diagnosed with mild global left ventricular systolic dysfunction with an ejection fraction at 47%.  (R. at 491-94.)

6

Plaintiff underwent a functional capacity evaluation by Mark Eskay, PT, OCS, in November 2011.  (R. at 583-614.)  Following two days of testing and evaluation, Mr. Eskay concluded that Plaintiff could complete a forty-hour work week.

### 2. Judith Brown, M.D.

Dr. Brown examined Plaintiff for disability purposes on August 29, 2011.  (R. at 339-48.)  Plaintiff reported that he had been taking medications for HIV since December 2010.  He complained of pigment changes in his skin as well as episodic nausea and fatigue, one-to-two headaches per week, problems sleeping, dizziness, and short-term memory difficulties.  He indicated that he could walk one or two blocks before needing to stop due to fatigue and that he did not have any problems walking stairs.

On physical examination, Dr. Brown noted that Plaintiff exhibited a normal gait, no use of an ambulatory aid, no muscle weakness, and normal reflexes.  She further noted that his intellectual functioning appeared normal, that he "is able to follow simple commands and instructions without difficulty, and that his "[c]onversational speech is heard and understood without difficulty."  (R. at 340.)  She indicated that his HEENT (head, eyes, ears, nose and throat) were normal and that his heart exhibited a regular rate and rhythm.  Dr. Brown found some irregular hyperpigmentation of Plaintiff's palms and soles in a mottled pattern.  She diagnosed Plaintiff as HIV positive.  (R. at 342.)  Dr. Brown concluded that her findings reflected that Plaintiff's ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying, and traveling, as well as his ability to push and pull heavy objects "appears to be at least mildly impaired."  (R. at 343.)

### 3.     State-Agency Evaluation

On September 9, 2011, state-agency physician Gary Hinzman, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 73-75.)  Dr. Hinzman opined that Plaintiff could frequently lift up to twenty-five pounds; occasionally lift up to fifty pounds; and stand, walk and/or sit for about six hours in an eight-hour workday.  (R. at 73.)  Dr. Hinzman further opined that it is likely throughout the course of an eight-hour workday that Plaintiff's fatigue would limit his strength.  (*Id.*)

Maria Congbalay, M.D., reviewed Plaintiff's records upon reconsideration on January 6, 2012, and opined that Plaintiff could frequently lift up to ten pounds; occasionally lift up to twenty pounds; and stand, walk and/or sit for about six hours in an eight-hour workday.  (R. at 85-86.)  Dr. Congbalay agreed with Dr. Hinzman that it is likely throughout the course of an eight-hour workday that Plaintiff's fatigue would limit his strength.  (R. at 86.)  Dr. Congbalay additionally opined that Plaintiff could never climb ladders, ropes, or scaffolds due to cardiomyopathy and that he must also avoid concentrated exposure to hazards.  (R. at 86-87.)

## B.     Mental Impairments

### 1.     Access Ohio Mental Health Center of Excellence

Plaintiff underwent a diagnostic assessment on April 10, 2012.  (R. at 518-29.)  Plaintiff reported that his primary care physician had referred him.  He also reported that he used to struggle with depression and suicidal thoughts.  He added that he had recently been having suicidal ideation again, but he denied any intent or plan.  He indicated that he had recently found out he is HIV positive, has heart failure, and syphilis.  He reported that he used to work in New York, but left after the September 11, 2001 attack.  He indicated that he saw people jump out of

buildings and that these images have been "coming back" to him.  (R. at 518.)  He added that his physical health is depressing him.  Plaintiff also reported low appetite, headaches, lack of motivation, crying spells, feeling nervous, poor memory, loss of train of thought, a short fuse, and anger issues.  He also reported that he felt spirits walk through him.

On mental status examination, Plaintiff exhibited average demeanor, eye contact, activity, and speech.  (R. at 529.)  The intake social worker diagnosed Plaintiff with major depressive disorder, recurrent; rule out psychotic features; and anxiety.  (R. at 526.)  Plaintiff was assigned a current Global Assessment of Functioning ("GAF") score of 35.[5]  (*Id.*)  It was recommended that Plaintiff see a psychiatrist and receive psychotherapy, community support, and medication/somatic services.  (*Id.*)

Plaintiff underwent an initial psychiatric evaluation with I. Chittiprolu, M.D., on May 2, 2012.  (R. at 514-17.)  On mental status examination, Dr. Chittiprolu described Plaintiff's mood as depressed, his affect as constricted, and his behavior as cooperative with good insight and judgment.  (R. at 515-16.)  Dr. Chittiprolu diagnosed Plaintiff with a depressive disorder and PTSD.  He increased Plaintiff's dose of Celexa and started him on Seroquel.  (R. at 516-17.)

---

[5]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  A GAF score of 31-40 is indicative of some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33-34.

Dr. Chittiprolu's treatment notes are mostly illegible, but indicate generally on mental status examination that Plaintiff demonstrated average eye contact, activity, demeanor, and speech, as well as that he was cooperative and expressed logical thoughts.  Plaintiff generally exhibited a depressed mood and constricted affect, but no hallucinations.  Plaintiff showed impaired memory, attention, and concentration.  (R. at 506-13.)  When Plaintiff presented for follow-up on May 23, 2012, he reported continued depression.  Dr. Chittiprolu, however, noted that he had intact thoughts and good cognition, insight, and judgment.  Dr. Chittiprolu adjusted Plaintiff's medications.  (R. at 512-13.)  In July 2012, Plaintiff reported that he had problems with his father, but that he was going to church and praying.  Dr. Chittiprolu noted that Plaintiff demonstrated a dull and tired mood and affect, but that he exhibited intact thoughts, good cognition, insight, and judgment, and that he was cooperative.  (R. at 510-11.)  Dr. Chittiprolu increased Plaintiff's dose of Seroquel in October 2012.  (R. at 542-43.)

In November 2012, Dr. Chittiprolu drafted correspondence addressed to "To Whom It May Concern" in which he noted that he had treated Plaintiff for seven months and opined as follows:

> Besides being diagnosed with Depression, Howard also suffers from an irregular heartbeat, occasional heart failure, frequent headaches, and HIV.  These diagnos[es] along with the medication prescribed to treat causes Howard to tire quickly and makes employment almost impossible.

(R. at 568.)

Dr. Chittiprolu opined on a mental functional capacity assessment that Plaintiff was not significantly limited in his understanding and memory or his ability to interact appropriately with the general public, but that the was moderately or markedly limited in a number of other areas, including sustained concentration and persistence, social interaction, and adaptation.  (R. at 569.)

10

Dr. Chittiprolu checked a box reflecting that he opined that Plaintiff was unemployable and would be for twelve months or more.  (*Id.*)

### 2. Margaret Smith, Ph.D.

Plaintiff was evaluated for disability purposes by Dr. Smith on June 20, 2011.  (R. at 325-30.)  Plaintiff reported that he has had depression since just before his HIV diagnosis and development of other medical problems.  Dr. Smith noted that Plaintiff dressed appropriately and exhibited clear, 100% intelligible speech.  She described Plaintiff's mood and affect as within normal range.  He reported no crying spells, but indicated that he has had some suicidal ideation but denied intent.  Dr. Smith did not observe any anxiety or deficits in his insight and judgment.  Plaintiff told Dr. Smith that he tries to keep his room clean and do the laundry, but that he puts off these tasks.  (R. at 327.)  Plaintiff also reported that he drives on average three times a week and bathes approximately twice per week.  Dr. Smith described Plaintiff's social skills as in the normal range and indicated that he did not lose focus during the forty-five minute interview.

Dr. Smith diagnosed a depressive disorder and assigned Plaintiff a GAF score of 55.  (R. at 328.)  Dr. Smith concluded that Plaintiff is expected to be able to understand and apply instructions in a work setting consistent with low-normal intellectual functioning.  She added that although Plaintiff may experience the subjective sense of reduced effectiveness in concentration, persistence, and pace when depressive symptoms increase, objective changes at a level prompting performance concerns by others are not to be expected.  Dr. Smith found no social limitations and further noted that she expected Plaintiff to appropriately respond to workplace pressures.  (R. at 329-30.)

### 3.    State-Agency Evaluation

On July 1, 2011, after review of Plaintiff's medical record, Todd Finnerty, Psy.D., a state-agency psychologist, assessed Plaintiff's mental condition and opined that he had mild restrictions in his activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace.  He further noted that Plaintiff had experienced no episodes of decompensation of an extended duration.  (R. at 71.)  Dr. Finnerty determined that the evidence did not establish the presence of the "C" criteria.  (*Id.*)  Dr. Finnerty concluded that Plaintiff's allegations were partially credible, noting that Plaintiff alleges crying spells and difficulty remembering things, but that the medical records indicate that he denied reports of crying spells and that he had the ability to remember five digits forward and three digits backward.  (R. at 72.)  Dr. Finnerty accorded Dr. Smith's opinion great weight.  (R. at 73.)

On January 10, 2012, state-agency psychologist Karen Steiger, Ph.D., reviewed the file on reconsideration and essentially affirmed Dr. Finnerty's assessment.  (R. at 83-84.)

## IV.    ADMINISTRATIVE DECISION

On April 12, 2013, the ALJ issued his decision.  (R. at 9–25.)  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014.  (R. at 14.)  At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantially gainful activity since his alleged onset date of October 10,

12

2010.[6] (*Id.*)  The ALJ found that Plaintiff had the severe impairments of HIV, congestive heart

failure, cardiomyopathy, depression, anxiety disorder, and post-traumatic stress disorder (PTSD).

(*Id.*)  He further found that Plaintiff did not have an impairment or combination of impairments

that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (R. at 15.)  At step four of the sequential process, the ALJ set forth

Plaintiff's RFC as follows:

> [Plaintiff] has the residual functional capacity to perform sedentary work . . .
> except he can never climb ladders, ropes, or scaffolds; can occasionally balance,
> stoop, kneel, crouch, crawl, and climb ramps and stairs; must avoid concentrated
> exposure to extreme temperatures, wetness, and humidity; and must avoid
> concentrated exposure to unprotected heights, hazardous machinery, and operational
> control of moving machinery.  Further, he is limited to simple, routine, repetitive
> tasks in a low-stress environment, defined as one involving only occasional decision
> making and occasional changes in routine, with no interaction with the public and
> only occasional interaction with co-workers.

---

[6] Social Security Regulations require ALJs to resolve a disability claim through a five-
step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a
dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d
727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five
questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or
   equal the criteria of an impairment set forth in the Commissioner's Listing of
   Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant
   perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual
   functional capacity, can the claimant perform other work available in the national
   economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

13

(R. at 17.) The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible. He assigned "little weight" to the opinions of the state-agency medical consultants and "some weight" to the opinion of Mr. Eskay, the physical therapist who performed the functional capacity evaluation. (R. at 18, 20.) With regard to Plaintiff's mental health impairments, the ALJ accorded "little weight" to the opinions of the state-agency psychologists, the consultative psychological examiner, and to Dr. Chittiprolo. (R. at 22-23.) Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy. (R. at 23.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id.*)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

14

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.  ANALYSIS

In his Statement of Errors, Plaintiff asserts that the ALJ's violated his due process rights

in allowing the VE to testify via telephone without providing prior notification. Plaintiff also

challenges the ALJ's RFC determination. As a threshold matter, the Undersigned first considers

Plaintiff's procedural challenge before turning to Plaintiff's challenge of the ALJ's RFC

determination.

### A.    Plaintiff's Challenge to the VE's Telephonic Testimony

Within this contention of error, Plaintiff seeks remand because the ALJ permitted the VE

to testify via telephone without providing notice in advance of the hearing. The Undersigned

finds that Plaintiff waived this challenge when he explicitly stated at the beginning of the

hearing that he did not have any objections to telephonic testimony by the VE.

The Social Security Administration ("SSA") regulations in effect at the time of the April

2, 2013 administrative hearing provided that the notice of hearing that the Commissioner sends

15

to the claimant in advance of the hearing must indicate whether any witness "is scheduled to be made by video teleconferencing rather than in person." 20 C.F.R. § 404.938(b) (effective Aug. 9, 2010 to June 19, 2013).  Thus, the regulations in effect did not explicitly contemplate telephonic witness testimony.  Less than three months after the hearing in the instant action, the SSA revised its procedures to clarify that an ALJ will allow the claimant or any other party to a hearing to appear by telephone following advance notice.  20 C.F.R. § 404.938(b) (effective June 20, 2013 to July 24, 2014).  The current version of the regulations likewise explicitly permit telephonic testimony and require the agency to inform the claimant whether his or her appearance "or that of any other party or witness is scheduled to be made in person, by video teleconferencing, or by telephone." 20 C.F.R. § 404.938(b) (effective July 25, 2014).

The parties do not dispute that to the extent the then-current regulations even permitted telephonic witness testimony, the SSA erred in failing to provide advance notice to Plaintiff indicating that the VE was scheduled to testify via telephone.  The Commissioner maintains, however, that the error was harmless given the absence of prejudice.  The United States Court of Appeals for the Sixth Circuit has not addressed this issue.  Other courts, however, have analyzed the issue and arrived at mixed results.  *Compare Henry v. Colvin*, 561 F. App'x 55, 57–58 (2d Cir. 2014) (finding harmless error where claimant did not object during the hearing, no technical issues arose, and no time constraints were placed on counsel's ability to cross-examine); *and Vandermark v. Colvin*, No. 3:13-cv-1467, 2015 WL 1097391, at *18 (N.D.N.Y. Mar. 11, 2015) (same); *and Lippincott v. Comm'r of Soc. Sec.*, 982 F.Supp.2d 358, 380 (D.N.J. 2013) (same); *and Cheatham v. Comm'r of Soc. Sec.*, No. 12-11428, 2013 WL 1843400, at *11 (E.D. Mich. 2013) (finding harmless error where the claimant did not object at the hearing and made no

16

showing that he was prejudiced by the telephonic testimony) *with Decker v. Comm'r of Soc. Sec.,* No. 2:12–CV–0454, 2013 WL 1363752 (S.D. Ohio Apr. 3, 2013), *adopted* 2013 WL 483961, at \*5 (Sept. 10, 2013) (declining to find harmless error based upon the court's finding that the absence of telephonic testimony presumptively prejudicial given the value of examining and observing witnesses) *and Edwards v. Astrue*, No. 3:10–cv–1017, 2011 WL 3490024 (D. Conn. Aug. 10, 2011) (same); *and Hanna v. Colvin*, No. 8:13-cv-1082, 2014 WL 2861487, at \*5–6 (M.D. Fla June 24, 2014) (same).  In the instant case, if this Court were to follow the line of cases declining to find presumptive prejudice, a finding of harmless error is appropriate given the absence of objections, technical issues, and time constraints at the hearing.

The Undersigned finds, however, that it is unnecessary to engage in a harmless error analysis because Plaintiff, represented by counsel, stated at the beginning of the hearing that he did not have any objections to telephonic testimony by the VE.  The Undersigned concludes that Plaintiff's explicit consent constitutes a waiver of any procedural challenge to the telephonic testimony.  Significantly, none of the cases upon which Plaintiff relies involved explicit consent by the claimant at the hearing to the testimony.  *See Edwards,* 2011 WL 3490024 (reversing where ALJ allowed telephonic testimony over the claimant's objection); *Koutrakos v. Astrue,* No. 3:11-cv-306, 2012 WL 1247263 (D. Conn. Apr.13, 2012) (same); *Decker v. Comm'r of Soc. Sec.,* 2013 WL 1363752, at \*6 (reversing where "the Court cannot find that plaintiff's counsel stipulated or agreed to [the VE's] testimony by telephone.").  Plaintiff's assertion that *Decker* stands for the proposition that "a due process violation of this type cannot be waived" is incorrect.  (Pl.'s Statement of Errors 9, ECF No. 9.)  Rather, the *Decker* Court specifically acknowledged the possibility of waiver as follows:

17

> Lastly, the Court might chart another course, treating the procedural irregularity (*if not waived*) as presumptively prejudicial, but carving out a small number of cases where remand would not serve any useful purposes. For the reasons that follow, that is the approach the Court will adopt.

2013 WL 1363752, at *7 (emphasis added). Because such a waiver occurred here, it is

**RECOMMENDED** that this contention of error be overruled.

## B.     Plaintiff's Challenge to the ALJ's RFC Determination

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

The Undersigned finds that the ALJ sufficiently articulated the reasons for his RFC determination and that those reasons are supported by substantial evidence. Significantly, with the exception Dr. Chittiprolo, of none of the treating, examining, or reviewing physicians or therapists found Plaintiff to be as limited as the ALJ determined. Plaintiff challenges the ALJ's determination, asserting that the he failed to consider pertinent information, improperly discounted the opinion of his psychiatrist, improperly evaluated his credibility, and failed to include a limitation reflecting that he would be off task fifteen percent of the time. The Court considers each Plaintiff's contentions in turn.

18

### 1.     Consideration of the Record

According to Plaintiff, the ALJ erroneously failed to "consider other pieces of evidence that contradict his declaration that [claimant's] heart condition was significantly improved." (Pl.'s Statement of Errors 3, ECF No. 9.)  Plaintiff specifically cites record evidence reflecting Plaintiff's chest pains and palpitations, a doctor's note indicating that he became fatigued when performing activities of daily living, his diagnosis of left ventricular systolic dysfunction, and his most recent ejection fraction.

Certainly, in making his determinations, the ALJ was required to consider the entire record.  *See Rogers*, 486 F.3d at 247 (noting that an ALJ must make credibility determinations "based on a consideration of the entire case record").  But "[n]either the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006)).

Regardless, here, the ALJ both considered *and* discussed each of the pieces of evidence Plaintiff cites.  (*See* R. at 19–20 (noting Plaintiff's "chest pain and palpitations" and "palpitations/tachycardia," that "[t]he stress test showed mild global left ventricular systolic dysfunction with an ejection fraction of 47% consistent with nonischemic cardiomyopathy," and that he "complained of significant dyspnea on exertion with routine activities like plowing snow and raking leaves").)  Indeed, the ALJ found Plaintiff's complaints of fatigue credible, a determination that prompted him to find that Plaintiff was more limited than Plaintiff's physical therapist and the state-agency experts found.  (*See* R. at 20–21 (finding Plaintiff to be "more

19

limited [than the state-agency physicians opined] when taking into account the combined

effects" of his impairments and further noting that the assessment of the physical therapist "does

not fully take into account [Plaintiff's] limitations from fatigue").)  Accordingly, it is

**RECOMMENDED** that the Court find this contention of error to be without merit.

### 2.       Weighing of Dr. Chittiprolo's Opinions

Plaintiff next asserts that the ALJ improperly discounted Plaintiff's treating psychiatrist,

Dr. Chittiprolo.  The ALJ must consider all medical opinions that he or she receives in

evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical

opinions as "statements from physicians . . . that reflect judgments about the nature and severity

of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do

despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are

likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a

patient's] medical impairment(s) and may bring a unique prospective to the medical evidence

that cannot be obtained from the objective medical filings alone . . . ."  20 C.F.R. §

416.927(d)(2);  *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling

weight."  20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ

must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544

20

(6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling

weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment
> relationship and the frequency of examination, the nature and extent of the treatment
> relationship, supportability of the opinion, consistency of the opinion with the record
> as a whole, and the specialization of the treating source—in determining what weight
> to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice determination or

decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. §

416.927(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to

any subsequent reviewers the weight the adjudicator gave to the treating source's medical

opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL

1725066, at *7 (6th Cir. Apr. 28, 2010) (internal quotation omitted).  The United States Court of

Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that his
> physician has deemed him disabled and therefore "might be especially bewildered
> when told by an administrative bureaucracy that she is not, unless some reason for
> the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).
> The requirement also ensures that the ALJ applies the treating physician rule and
> permits meaningful review of the ALJ's application of the rule.  *See Halloran v.
> Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v.

Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson*

factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL

3521928, at *6 (6th Cir. Aug. 31, 2010) (indicating that, under *Blakley* and the good reason rule,

an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. §

404.1527(d)(2) for weighing medical opinion evidence within the written decision).

In the instant case, the parties do not dispute that Dr. Chittiprolo is a treating physician.

The ALJ thoroughly discussed Dr. Chittiprolo's treatment notes and considered the opinion he

offered in the November 2012 correspondence and also the mental functional capacity

assessment form he completed.  (*See* R. at 21–23.)  He, however, accorded "little weight" to Dr.

Chittiprolo's opinion that Plaintiff's physical impairments precluded employment, as well as to

his opinion that Plaintiff displayed marked deficits.  (R. at 23.)  The ALJ reasoned as follows:

> I give little weight to the opinion of the [Plaintiff's] treating psychiatrist that
> [Plaintiff's] physical impairments and medications cause him to tire quickly and
> make employment almost impossible.  This assessment is beyond the scope of this
> provider's specialty and treatment of the claimant.  Further, the issue of disability is
> reserved to the Commissioner.  I also give little weight to the opinion of this provider
> indicating multiple marked deficits, including in attention/concentration, attendance
> and maintaining a schedule, sustaining a routine without special supervision,
> working in coordination with others, and completing a normal work day and week
> without interruption form symptoms.  The content of this provider's records is quite
> limited and largely illegible.  Further the mental status examination findings that are
> legible simply do not support this degree of limitation.

(*Id.* (internal citations omitted).)

Plaintiff complains that the ALJ should have accorded Dr. Chittiprolo's opinions greater

weight:

> Here, there is no evidence indicating that Mr. Ramsay's psychiatrist used
> unacceptable diagnostic techniques in treating him.  The psychiatrist's notes are
> generally consistent with the other evidence in the record in that they all confirm
> diagnoses of depression, PTSD, and anxiety.  The differences primarily lie in the
> degree of impairment that these conditions have caused.  In treating him most
> consistently, Mr. Ramsay's psychiatrist would have the most comprehensive
> understanding of how his mental conditions impair him.

(Pl.'s Statement of Errors 5, ECF No. 9.)

The Undersigned finds that the ALJ provided legally sufficient reasons for rejecting Dr. Chittiprolu's opinions.  As a threshold matter, the Undersigned notes that the ALJ agreed with Plaintiff's assertion that Dr. Chittiprolo's notes were consistent with other evidence in the record with regard to his diagnoses in that the ALJ found that each of the conditions Dr. Chittiprolo diagnosed to be severe impairments.  (*See* R. at 14.)  But that Plaintiff suffered from these diagnosed conditions does not require the conclusion that he was disabled.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of [the condition] . . . says nothing about the severity of the condition." (citation omitted)).  As Plaintiff concedes, the inconsistencies between the record evidence and Dr. Chittiprolu's opinions "lie in the degree of impairment these conditions caused."  (Pl.'s Statement of Errors 5, ECF No. 9.)  On this point, the Undersigned finds that the ALJ provided legally sufficient reasons for rejecting Dr. Chittiprolo and that those reasons are supported by substantial evidence.

First, as the ALJ properly observed, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to any particular weight or special significance.  20 C.F.R. § 404.1527(d); *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).  Second, the ALJ properly considered that Dr. Chittiprolu assessment of the limitations flowing from Plaintiff's physical conditions was beyond the scope of the mental health treatment he provided.  *See* 20 C.F.R. § 404.1527(c)(4) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a

23

source who is not a specialist."). Significantly, none of the specialists who treated Plaintiff for his physical conditions nor the state-agency physicians offered an opinion supporting or consistent with Dr. Chittiprolu's extreme opinion. Third, as the ALJ pointed out, Dr. Chittiprolu's extreme assessments were not supported by his mental status examination findings or his own treatment notes. *See* 20 C.F.R. § 404.1527(c)(3) (identifying "supportability" as a relevant consideration). For example, although the Dr. Chittiprolu checked boxes on a form reflecting that he found Plaintiff to be moderately or markedly limited in sustained concentration and persistence, social interaction, and adaptation, his treatment notes and examination findings reflect that he observed Plaintiff displaying cooperative behavior; good cognition, insight, and judgment; and logical thoughts. (R. at 506–16.) Finally, as even Plaintiff concedes, the degree of impairment Dr. Chittiprolu assessed is more extreme than that offered by any of the other medical sources. *See Blakley*, 581 F.3d at 406 (quoting SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)) ("'[I]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if . . . it is inconsistent the with other substantial evidence in the case record.'").

In sum, because the ALJ provided legally sufficient reasons supported by substantial evidence for the weight he accorded Dr. Chittiprolu's opinions, it is **RECOMMENDED** that the Court find this contention of error to be without merit.

### 3. Credibility Assessment

Although Plaintiff does not directly assert that he is attacking the ALJ's credibility assessment, he asserts that the ALJ erroneously concluded that he was capable of performing sedentary work and relies upon his own allegations to argue that he is not. (*See* Pl.'s Statement

of Errors 5–7, ECF No. 9 (citing his allegations that he is unable to perform yard work, spends

most of his day sitting, becomes tired by walks, and has limited social interactions to argue that

he is not capable of the requirements of sedentary work, including standing for two hours and

responding to supervisors and change).)

The Sixth Circuit has provided the following guidance in considering an ALJ's

credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he

[or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F.

App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th

Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining

to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew,

resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This

deference extends to an ALJ's credibility determinations "with respect to [a claimant's]

subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009)

(quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir.1987)). Despite

this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial

25

evidence." *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision).

Applied here, the Undersigned finds no error in the ALJ's credibility assessment. Notably, the ALJ found Plaintiff's complaints of fatigue, episodes of nausea, and dizziness credible and included limitations to accommodate these symptoms in the RFC.  He likewise included limitations to address the mental limitations he found credible.

The ALJ articulated numerous bases for finding Plaintiff's allegations of greater limitation not credible.  For example, he pointed out that despite Plaintiff's allegations of

26

constant headaches, frequent dizziness, and fatigue, he drove numerous times per week.  The ALJ also pointed out, among other considerations, that despite the alleged severity of his mental impairments, Plaintiff delayed seeking significant treatment until April 2012, declined to follow treatment recommendations to increase his activity and attend group therapy, demonstrated normal social skills and cooperation during appointments, attended church, and lived with two friends.  The ALJ also found that Plaintiff's mental status examination findings did not support the alleged severity.  In addition, the ALJ pointed out that Plaintiff's more recent medical exams were unremarkable, he had exhibited improvement, and his physician indicated that he did not need to see Plaintiff again for a year.  (R. at 19–20, 638.)  He further noted that in February 2012, Plaintiff reported that he could complete a flight of stairs or walk over 100 yards without issue, and in August 2012, he reported improvement and denied shortness of breath with activities.  (R. at 643.)  The Undersigned finds that the foregoing valid reasons the ALJ offered for discounting Plaintiff's allegations constitute substantial evidence supporting his credibility determination.  Accordingly, it is **RECOMMENDED** that the Court find this contention of error to be without merit.

### 4. Ability to Remain on Task

Within this final contention of error, Plaintiff contends that the ALJ failed to account for his latest ejection fraction of 47%, which Plaintiff maintains would render him off task at least 15% of the time.  The Undersigned finds this argument to be unpersuasive because no source opined that this testing result would preclude an individual from remaining on task or otherwise preclude sedentary work.  Indeed, Dr. Maffet characterized Plaintiff's heart disfunction as mild.  (R. at 491-94.)  It is therefore **RECOMMENDED** that the Court find this contention of error to

27

be without merit.

## VII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.    PROCEDURE ON OBJECTIONS

If Plaintiff seeks review by the District Judge of this Report and Recommendation, he may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

Plaintiff is specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed,

appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

     **IT IS SO ORDERED.**


Date: June 5, 2015                 *    /s/ Elizabeth A. Preston Deavers    *
                                                Elizabeth A. Preston Deavers
                                                United States Magistrate Judge